## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY COLEMAN, | ) | CASE NO. 1:16CV00931 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jeffrey Coleman ("Plaintiff" or " Coleman"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

## I.    PROCEDURAL HISTORY

In September 2011, Coleman filed applications for POD, DIB, and SSI, alleging a disability onset date of October 2009 and claiming he was disabled due to "high blood pressure, sleep apnea, diabetes, scarred lungs, feet swelling, depression, blackouts, [and] stiffness of joints."  (Transcript ("Tr.") 194, 325, 386.)  The applications were denied initially and upon reconsideration, and Coleman requested a hearing before an administrative law judge ("ALJ"). (Tr. 171, 194.)

On December 21, 2012, an ALJ held a hearing, during which Coleman, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 171, 46-104.)  On January 2, 2013, the ALJ issued a written decision finding Coleman was not disabled.  (Tr. 171-186.) Coleman requested review by the Appeals Council and, on March 5, 2014, the Appeals Council remanded for further proceedings.[2]  (Tr. 188-189.)

On June 6, 2014, a different ALJ held a hearing, during which Coleman, represented by counsel, and an impartial VE testified.  (Tr. 18-44.)  On August 14, 2014, that ALJ issued a written decision finding Coleman was not disabled.  (Tr. 194-203.)  The ALJ' s decision became final on February 19, 2016, when the Appeals Council declined further review.  (Tr. 2-5.)

On April 19, 2016, Coleman filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 12.)

---

[2]  As discussed *infra*, the Appeals Council vacated and remanded because the hearing decision (1) found that Coleman had moderate difficulties in social functioning and with concentration, persistence or pace as a result of his severe mental impairments but the RFC assessment failed to contain any limitations relating to concentration, persistence, or pace; and (2) failed to evaluate Coleman's obesity under Social Security Ruling 02-1p. (Tr. 188.)

2

Coleman asserts the following assignments of error:

(1)     The ALJ ignored the directives of the Appeals Council regarding Mr. Coleman's severe mental impairments.

(2)     The ALJ failed to evaluate obesity in compliance with SSR 02-1p.

(3)     The ALJ erred by failing to find Mr. Coleman disabled at least by his 50th birthday.

(Doc. No. 10.)

## II.    EVIDENCE

### A.     Personal and Vocational Evidence

Coleman was born in December 1960 and was fifty-three (53) years-old at the time of his second administrative hearing, making him a "person closely approaching advanced age," under social security regulations.  (Tr. 201.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has at least a high school education and is able to communicate in English.  (Tr. 201.)  He has past relevant work as a tow motor operator and receiving checker.  (*Id*.)

### B.     Relevant Medical Evidence

#### 1.        Physical Impairments

On April 27, 2010, Coleman began treatment at the Veterans Administration ("VA") with Susan Kirsh, M.D., for complaints of excessive fatigue.  (Tr. 492–494.)  He weighed 295 pounds and he had an elevated blood pressure reading of 155/102.  (Tr. 493.)  Coleman returned to Dr. Kirsh on July 13, 2010, and was found to have an elevated blood pressure reading of 166/96. (Tr. 490.)  Coleman's blood pressure was elevated again in September 2010, and he was prescribed Lisinopril.  (Tr.  487-489.)  At that time, he weighed 289 pounds and had a Body Mass Index ("BMI") of 38.3.  (*Id.*)  Dr. Kirsh referred Coleman to diabetes self-management

3

classes.  (*Id.*)

The record reflects Coleman attended diabetes classes in October 2010.  (Tr. 481-486.)
On October 27, 2010, he showed some improvement, with his blood pressure down to 138/84
and a BMI of 37.56.  (Tr. 471-475.)  Coleman reported "learning a lot" at his diabetes
management classes, and stated he had lost twelve pounds in the past six months.  (Tr. 472.)  He
indicated he biked and walked every day until tired.  (*Id.*)  In November 2010, however,
Coleman stated his blood pressure was "uncontrolled and causing him to black out."  (Tr. 470.)

On February 1, 2011, Coleman presented to VA physician, Amy Schechter, M.D.  (Tr.
466-468.)  He stated he was "less tired, but still falls asleep very easily."  (Tr. 467.)  His blood
pressure was 146/93.  (*Id.*)  Dr. Schechter assessed diabetes, hypertension, dyslipidemia, and
possible sleep apnea.  (*Id.*)  She referred him for a sleep study and an eye exam.  (*Id.*)  Several
days later, Coleman underwent diabetic teleretinal imaging, which was negative for diabetic
retinopathy in both eyes.  (Tr. 463.)

On April 12, 2011, Coleman underwent a sleep study due to "snoring, stopping breathing,
daily fatigue, drowsy driving, witnessed apnea, daytime sleepiness, frequent awakenings."  (Tr.
458.)  He averaged 14.4 sleep arousals per hour, and recorded a low O2 saturation of 62.3%.
(Tr. 458-459.)  Pulmonologist Kingman Strohl, M.D., diagnosed Coleman with severe sleep
apnea and excessive hypoxemia.  (Tr. 459.)  Dr. Strohl recommended CPAP therapy, as well as a
cardiopulmonary assessment due to excessive hypoxemia and an unstable upper airway.  (*Id.*)

Coleman returned to Dr. Kirsh on June 14, 2011.  (Tr. 451-453.)  He reported he
"recently had sleep study and got CPAP machine for the last six weeks and is feeling a whole lot
better."  (Tr. 452.)  Coleman's blood pressure was 163/97 and he weighed 284.8 pounds.  (*Id.*)

He admitted to non-compliance with his blood pressure medication, stating his blood pressure readings seemed "pretty good" at home.  (Tr. 453.)  With regard to his obesity, Coleman indicated he was "not interested in weight loss."  (*Id.*)

In September 2011, Coleman requested a certification from Dr. Kirsch that he was unable to work due to his medical condition.  (Tr. 445.)  Specifically, Coleman "stated he should not have been fired and is seeking medical documentation to support his inability to work (at the time he was employed)."  (Tr. 443.)  Dr. Kirsh responded that "patient has NO known reason that he can not work."  (Tr. 444.)

Coleman returned to Dr. Schechter in November 2011.  (Tr. 612-616.)  He reported "doing well;" however, he also requested a referral to a psychiatrist for treatment of depression.  (Tr. 614.)  His blood pressure was 137/93, and he weighed 284 pounds.  (*Id.*)  Dr. Schechter noted as follows:

> I explained to [patient] that if he is without an income for the last 2 years, he may have a better chance of qualifying for a veteran's pension than for SS/disability, since none of his diagnoses are disabling from work.  He insisted that he will get SS benefits because he has been unemployed for so long and he believes that God will do this for him, however he agreed to go see a veteran's service representative to inquire about VA pension.

(Tr. 615.)

On February 28, 2012, Coleman presented to Dr. Schechter, with complaints of difficulty sleeping, depression, and shortness of temper.  (Tr. 631-634.)  He reported he had "lost an old girlfriend," and requested Prozac.  (Tr. 633.)  Coleman's blood pressure was 134/90 and his weight was 284 pounds.  (*Id.*)  Dr. Schechter noted he "leans back in chair, closes eyes when speaking often."  (*Id.*)  She diagnosed diabetes mellitus type 2/obesity, hypertension, dyslipidemia, obstructive sleep apnea, and "psychiatric issues."  (Tr. 634.)  With regard to his

sleep apnea, Coleman reported he "wants no further [follow up] on this."  (*Id*.)  Dr. Schechter

prescribed Trazadone to aid with sleep, and referred him for a psychiatric consult.  (*Id*.)

On April 17, 2012, Coleman presented to nurse practitioner Anita Compan for evaluation

and treatment of persistent transaminase elevations.  (Tr. 655-657.)  He reported feeling "okay"

with a good appetite and no abdominal discomfort.  (Tr. 656.)  Ms. Compan assessed "persistent,

but mild, transaminase elevations with otherwise preserved liver synthetic function."  (Tr. 657.)

She thought Coleman "most likely has a component of fatty liver disease," but recommended a

work up "for other nonviral, genetic, and autoimmune causes of liver disease to say this with

more certainty."  (*Id*.)  Ms. Compan referred Coleman for a liver ultrasound, and "encouraged

lifestyle modifications aimed at weight loss, including improved diet and increase in activity

level."  (Tr. 657-658.)  She offered a consult to a weight management program, but Coleman

declined.  (Tr. 658.)

Coleman thereafter underwent a liver ultrasound on May 14, 2012, which showed that

"the liver is diffusely increased in echogenicity consistent with fatty infiltrate."  (Tr. 658, 706-

707.)

On October 10, 2012, Coleman returned to Ms. Compan for follow-up regarding his

elevated transaminases.  (Tr. 696-697.)  He reported feeling "okay," with a fair energy level and

good appetite.  (*Id*.)  Coleman's blood pressure was 143/91and he had a BMI of 38.4 (291

pounds).  (*Id*.)  On examination, Ms. Compan noted Coleman was alert, oriented, and pleasant,

with a normal gait.  (*Id*.)  She concluded that "[g]iven metabolic syndrome, imaging findings,

and negative workup for other viral, genetic, and autoimmune causes of chronic liver disease, he

most like has a component of NAFLD [non-alcoholic fatty liver disease.]"  (*Id*.)  Ms. Compan

6

again encouraged lifestyle modifications and offered a consult to a weight management program. (*Id.*) Coleman, however, declined and "did not appear too motivated to do much of anything." (*Id.*) Ms. Compan noted Coleman's transaminases were unlikely to improve without weight loss. (*Id.*)

Coleman returned to Dr. Schechter on October 16, 2012. (Tr. 690-693.) Dr. Schechter noted Coleman did not "yet technically meet the criteria for" type II diabetes. (Tr. 692.) She discussed with him the need for lifestyle modifications but Coleman "vehemently declines to exercise." (*Id.*) Dr. Schechter also discussed with Coleman the risks of hypertension "but he was adamant about not wanting to increase meds or do anything else to further modify his risk of stroke." (*Id.*) In particular, Dr. Schechter noted she "explained to him that disability, paralysis, renal failure, organ dysfunction and death can result from chronically uncontrolled [blood pressure] and he continued to decline any intervention." (*Id.*)

On January 29, 2013, Coleman presented to Dr. Schechter with complaints of ankle stiffness. (Tr. 749-752.) His blood pressure was 146/95 and he weighed 289 pounds. (Tr. 751.) Examination revealed no swelling or tenderness in Coleman's ankles. (*Id.*) Dr. Schechter again discussed with Coleman his sedentary lifestyle but he was "definitely still precontemplative." (*Id.*) She noted that "[m]y sense is this is from psychological factors but next time will ask more questions about physical discomfort/pain that may be a hindrance to exercise." (*Id.*)

On March 19, 2013, Coleman presented to podiatry resident Michael Doran, M.D., for a consultation regarding his ankle pain. (Tr. 783-787.) Coleman complained "the pain is a 6/10 and that both of his feet just feel stiff and it has lasted for his entire life." (Tr. 783.) He further stated that "he used to be able to work through the pain but now that he has gotten older it keeps

7

getting worse." (*Id.*)  On examination, Dr. Doran noted intact sensation; 5/5 muscle strength in Coleman's plantarflexors, dorsiflexors, everters and inverters; decreased range of motion in his ankle joint with pain and without crepitus; and "pain on palpation to anterior ankle gutter." (Tr. 786-787.)  Dr. Doran diagnosed bilateral pes planus (or flat feet), bilateral limb pain, and diabetes.  (Tr. 787.)  He ordered x-rays of Coleman's feet and ankles, and referred him to prosthetics for "powerstep orthotics." (*Id.*)

Coleman underwent bilateral feet and ankle x-rays on March 19, 2013.  (Tr. 795-798.)  The ankle x-rays were normal; however, the x-rays of Coleman's feet showed bilateral pes planus more notable on the left. (*Id.*)

On April 2, 2013, Coleman presented to podiatry resident Melanie M. Johnson, M.D. for follow-up of his bilateral ankle/foot pain.  (Tr. 728-732.)  He described the pain as a 7/10, and again stated it had been "present for several years and ha[d] gotten progressively worse." (Tr. 728.)  Coleman indicated he had been using Powerstep inserts but "the pain has moved from the front of the ankle to the inside of the ankle and the patient is not satisfied with the inserts." (*Id.*)  On examination, Dr. Johnson noted no edema or variscosities; intact sensation bilaterally; 5/5 muscle strength in Coleman's plantarflexors, dorsiflexors, everters and inverters; decreased range of motion in his ankle joint with pain and without crepitus; and "pain on palpation to anterior ankle gutter." (Tr. 731.)  Dr. Johnson diagnosed pes planus, hallux limitus, diabetes, and bilateral ankle arthritis. (*Id.*)  She referred Coleman for casting for custom orthotics, and ordered two pairs of lack up ankle braces to be worn "with any activity." (*Id.*)  The record reflects Coleman was casted and fit for custom orthotics a few weeks later.  (Tr. 722, 714.)

Coleman returned to Dr. Schechter on July 2, 2013.  (Tr. 709-712.)  He reported "trying

8

out" the orthotics, stating "he feels a difference but notes swelling and pain at achilles tendons when mowing the lawn." (Tr. 711.)  Coleman's blood pressure was 151/101 and his weight was 297 pounds.  (*Id.*)  On examination, Dr. Schechter noted no edema and slight tenderness bilateral achilles tendons.  (*Id.*)  She diagnosed hypertension, diabetes mellis 2; and possible achilles tendonitis. (*Id.*)

### 2.    Mental Impairments

On November 21, 2011, Coleman presented to Ashleigh Anderson, M.D., for a psychiatry assessment/evaluation.  (Tr. 608-612.)  Coleman reported multiple stressors, including health concerns and losing his job.  (Tr. 608.)  He reported no history of psychiatric treatment or medication.  (*Id.*)  He stated his mood was "mild" and his concentration and energy level were "good."  (Tr. 609.)  He denied all depressive, manic, or psychotic symptoms.  (*Id.*)  When asked why he was seeking psychiatric help at this time, Coleman stated "I found out that if I do have depression it helps with my social security case, so the more stuff I can pile on the better to help with my case."  (Tr. 608-609.)

On examination, Dr. Anderson noted Coleman was "cooperative with poor eye contact, eyes were closed during most of [the] interview."  (Tr. 611.)  Dr. Anderson noted Coleman was alert and oriented with normal speech and motor activity, "mild" mood, a "full-range" affect, and linear, logical, and goal directed thought process.  (*Id.*)  She assessed poor judgment based on statements made by Coleman during the assessment that "he steals money from people for finances."  (*Id.*)  In her assessment, Dr. Anderson noted as follows: "Pt made it very clear during interview that if he was diagnosed with a psychiatric condition it would further assist his disability case.  Pt did not endorse any psychiatric symptoms during interview, therefore

9

medication or psychotherapy is not indicated at this time."  (*Id*.)  She diagnosed "Cluster B

traits,"[3] and assessed a Global Assessment of Functioning[4] of 60, indicating moderate symptoms.

(*Id*.)

Coleman returned to Dr. Anderson on January 23, 2012.  (Tr. 602-604.)  He reported his

ex-girlfriend with whom he had been very close had recently died.  (Tr. 602.)  He also

complained of having a short temper, and recounted an incident where he was pulled over by the

police for making a U-turn, refused to show his driver's license, and was placed in handcuffs.

(*Id*.)  Coleman stated "he had passive thoughts of [suicidal intent] with plan to shoot himself

around New Years, but has not had thoughts of this since that time."  (*Id*.)

On examination, Dr. Anderson again noted Coleman was "cooperative with poor eye

contact, eyes were closed during most of [the] interview."  (Tr. 603.)  Dr. Anderson found

Coleman to be alert and oriented with normal speech and motor activity, "not great" mood, a

"full-range" affect with "inappropriate laughing at times," and linear, logical and goal directed

thought process.  (*Id*.)  She assessed fair insight and poor judgment.  (*Id*.)  Dr. Anderson found

---

[3] "Cluster B" traits include personality disorders characterized by dramatic, overly emotional, or unpredictable thinking or behavior.  They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder, and narcissistic personality disorder.  *See* http://www.mayoclinic.org/diseases-conditions/personality-disorders/symptoms-causes/dxc-20247656.

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

10

Coleman "continues to be without psychiatric symptoms at this time," and "is a low risk for self-harm."  (Tr. 603-604.)  She again diagnosed Cluster B traits, and assessed a GAF of 60.  (*Id*.)

On February 3, 2012, Coleman spoke with Dr. Schechter and stated "he is now symptomatic (problems sleeping, eating, mood) with grief/depression after death of his girlfriend."  (Tr. 604.)  He denied suicidal ideation but thought medication "might be useful." (*Id*.)  Dr. Schechter advised him to follow up with psychiatry.  (*Id*.)

Coleman presented to clinical nurse specialist Phyllis J. Goldbach on March 15, 2012, with complaints of sleep difficulties, recent grief issues, and anger issues.  (Tr. 662-667.)  Ms. Goldbach noted the following comments made by Coleman during the assessment:

> "I want money from the VA."  "I want help getting SSD."  "I don't work," "I want Prozac," "I fight a lot," " You are a 2nd opinion," "The other woman didn't know what she was talking about," "I get angry easily and threaten to hurt people," "I have road rage," "I found out that if I do have depression it helps with my social security case, so the more stuff I can pile on the better to help with my case."

(Tr. 662.)  Ms. Goldbach also observed Coleman "never mentioned grief issues until entire assessment was completed and was told no meds would be offered.  Then he stated 'oh by the way, my [girlfriend] died.'"  (Tr. 663.)  She also noted that Coleman denied alcohol and drug use, but then stated he "was drunk on new years eye and almost accidentally shot himself in the head."  (*Id*.)

On examination, Ms. Goldbach found Coleman was alert, oriented and "mostly cooperative with poor eye contact, eyes were closed frequently."  (Tr. 663.)  She noted Coleman attempted to intimidate her, wanted "immediate gratification," and had a "sense of entitlement." (*Id*.)  She found normal motor activity and speech; linear, logical and goal directed thought process, and a "fair" mood.  (*Id*.)  Ms. Goldbach also observed Coleman "angers easily," and

11

was "laughing, smiling freely when talking about violence." (*Id.*)  Ms. Goldbach diagnosed "rule out malingering for financial gain," and "antisocial, Cluster B traits," and assessed a GAF of 60.  (Tr. 666-667.)  She felt medication was not warranted, but recommended therapy for "anger issues, violent tendencies, and possible med seeking for secondary gains."  (Tr. 667.)  Ms. Goldbach noted Coleman refused group therapy.[5]  (*Id.*)

**C.     State Agency Reports**

**1.        Physical Impairments**

On January 9, 2012, Coleman underwent a consultative examination with Eulogio Sioson, M.D.  (Tr. 557-561.)  Coleman reported a two year history of hypertension and diabetes mellitus, as well as a diagnosis of sleep apnea.  (Tr. 557.)  He stated he used to "black out" when driving, watching TV, and working.  (*Id.*)  Coleman indicated he was "tolerating his CPAP, 'black out' occurs less frequently now."  (*Id.*)  He did report shortness of breath, excessive coughing spells, and some wheezing.  (*Id.*)  With regard to his diabetes, Coleman stated he had blurry vision as well as "numbness in his hands and feet – gets more tingling and knee gives out after walking half a block, going up and down 9 steps, standing and sitting for 2 hours."  (*Id.*)  He reported he was able to do dress and bathe himself, perform household chores, and lift and carry 10 pounds.  (*Id.*)  Coleman rated his pain a 4 on a scale of 10.  (*Id.*)

On examination, Dr. Sioson noted Coleman's blood pressure was 150/100 and his weight

---

[5] Additionally, on October 16, 2012, Coleman presented to Dr. Schechter with physical complaints.  (Tr. 690-693.)  While there, he requested that Dr. Schechter print a copy of his "problem list" and noticed a diagnosis of antisocial personality disorder.  (Tr. 692.)  Dr. Schechter explained that "the designation is one used in medicine to denote a person whose sense of social rules differs from then norm."  (*Id.*)  Coleman "laughed about it, and when [Dr. Schechter] suggested he might discuss it with his [mental health] provider, said, no it didn't matter."  (*Id.*)

was 279 pounds.  (*Id*.)  Coleman walked normally with no assistive device, was able to get up

and down from the examination table and do heel to toe walking, and rose from a quarter squat

with no pain.  (*Id*.)  Dr. Sioson found Coleman's extremities showed no edema, variscosities,

ulceration or stasis changes.  (Tr. 558.)  He had no tenderness, heat, redness, swelling,

subluxation and gross deformity in the joints "except he has flat feet."  (*Id*.)  Dr. Sioson found

Coleman's knees showed no apparent effusion or gross instability, and Coleman was able to

grasp the dynamometer and manipulate with each hand.  (*Id.*)

In addition, Dr. Sioson noted Coleman had palpable pedal pulses, and no neck or lower

back tenderness.  (*Id*.)  He found Coleman had tingling numbness in his feet but not his hands,

knee reflexes of 1+, no muscle atrophy, normal manual muscle testing, negative Romberg's with

no arm drift, and no cerebellar signs.  (*Id*.)  Range of motion testing revealed a reduced range of

motion in Coleman's shoulders, dorsolumbar spine, hip, and knees.  (Tr. 560-561.)

Dr. Sioson diagnosed (1) hypertension/sleep apnea; (2) diabetes mellitus, "probably with

peripheral neuropathy;" and (3) obesity with a BMI of 37.8.  (Tr. 558.)  He concluded that "if

one considers limitation of range of motion from pain and above findings, work-related activities

would be limited to light work."  (*Id*.)

On January 17, 2012, state agency physician Leon Hughes, M.D., reviewed Coleman's

medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.

(Tr. 115-117.)  He found Coleman could lift and carry 20 pounds occasionally and 10 pounds

frequently; stand and/or walk for a total of about six hours in an eight hour workday; and sit for a

total of about six hours in an eight hour workday.  (Tr. 115-116.)  Dr. Hughes further opined

Coleman had unlimited push/pull and balancing capacities, but could only occasionally climb

ramps and stairs, stoop, kneel, crouch and crawl.  (*Id.*)  Coleman could never climb ladders, ropes, or scaffolds.  (*Id*.)  Dr. Hughes found Coleman had no manipulative limitations.  (*Id.*)  However, he should (1) avoid concentrated exposure to extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation; and (2) avoid all exposure to hazards.  (Tr. 116-117.)  In particular, Dr. Hughes found Coleman should not engage in work involving commercial driving, unprotected heights, or operation of hazardous equipment.  (Tr. 117.)

On May 11, 2012, state agency physician Steve McKee, M.D., reviewed Coleman's medical records and completed a Physical RFC Assessment.  (Tr. 146-147.)  He agreed with Dr. Hughes' assessments regarding Coleman's physical functional limitations.  (*Id.*)

### 2.     Mental Impairments

On December 22, 2011, Coleman underwent a consultative psychological examination with Herschel Pickholtz, Ed.D.  (Tr. 545-553.)  Coleman reported experiencing "some depression and anger," but denied any past psychiatric treatment or medication.  (Tr. 546.)  He claimed to experience mild affective symptoms once a week for 20 minutes per occurrence.  (Tr. 549.)  Coleman denied any symptoms of anxiety.  (Tr. 549.)

On examination, Dr. Pickholtz "saw no signs of aberrant behavior ."  (Tr. 548.)  Coleman's motivation and cooperation "fell within the average range," and there was no sign of impulsivity or compulsions.  (*Id.*)  His verbalizations were coherent and relevant, and "there were no signs of any pressured speech, rambling, perseveration, or flight of ideas, or psychotic processing."  (*Id.*)  His affect was normal and mood was appropriate.  (*Id.*)  Coleman's "degree of alertness" and ability to recall objects after a 20 minute lapse fell within the low average range.  (Tr. 549.)  His "abilities for arithmetical capacities" fell within the borderline range, as

14

did his capacities for abstract thinking and recall of long-term history.  (Tr. 549-550.)  Dr. Pickholtz determined Coleman's estimated level of intelligence fell within the borderline range, but noted "there was a real discrepancy between the responses to the evaluation and the quality and quantity of his daily living activities and pre morbid levels of intellectual functioning in accordance with prior levels of academic achievement and work history.[6]"  (Tr. 550.)

Dr. Pickholtz summarized his findings as follows:

The etiology of mild deficits in attention, concentration, and intelligence needs to be further evaluated by medical personnel.

He was not previously diagnosed as having any psychiatric conditions and he complains of falling asleep during different activities and is not as smart as before and has some trouble with short-term and long-term memory.  His current levels of intellectual functioning based upon the results of the mental status fell within the borderline range of performance.  The current estimated IQ based upon the mental status evaluation is not consistent with premorbid levels of functioning which seemed to fall within the average range.  Short-term memory as reflected by performance on the mental status evaluation, more specifically related to recall of digits, arithmetic computations, reflects capacities falling between the low average and borderline ranges.  Long-term memory capacities, based upon recall of personal history, seem to be within the low average range.  This is not consistent with his abilities to recall, perform, and describe daily living routine and activities.  Levels of attention and concentration reflected in the current evaluative process fell within the mild range of impairment.  The extent of current affective complaints appear to fall within the mild range, based upon abilities to carry out daily activities in a consistent manner, to socialize with others and to respond to the demands of the evaluative process.  The extent of psychotic processing was within the non-existent range of impairment.  The impact of mental and psychiatric complaints on the capacities to perform daily activities in an appropriate and timely fashion, interact with others and care for the wants, needs, and demands of daily living seems to fall within the mild range.  The aforementioned ratings are considered to be accurate estimates of current functioning without the benefits of mental health medication, monitorship, and therapy.

---

[6] Coleman told Dr. Pickholtz that he graduated from high school and completed two years of college with a GPA of 3.0.  (Tr. 546.)  He also reported having worked at Giant Eagle for 20 years, and serving with the Air Force for 7 years.  (Tr. 547-548.)

15

(Tr. 551.)  Dr. Pickholtz diagnosed depressive disorder, NOS, mild; and cognitive disorder, NOS, which may be related to organic or psychiatric issues.  (*Id*.)  He assessed a GAF of 61, indicating mild symptoms.  (Tr. 552.)

In the Functional Assessment portion of his evaluation, Dr. Pickholtz found Coleman's capacities to understand, remember, and carry out instructions fell within the "slight range of impairment."  (Tr. 552.)  He also determined Coleman's capacities for attention and concentration fell in the "low average and borderline ranges," but found his "capacities to perform 1 to 3 step tasks for unskilled and low skilled labor are slightly impaired."  (*Id*.)  With regard to Coleman's social functioning, Dr. Pickholtz found "his capacities to relate to coworkers and supervisors are slightly impaired due to his mild memory and intellectual deficits."  (*Id*.)  Finally, Dr. Pickholtz concluded that Coleman's "capacities to handle the pressure of work comparable to previous work capacities [fell] within the slight range of impairment."  (*Id*.)

On January 3, 2012, state agency physician Bonnie Katz, Ph.D., reviewed Coleman's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 113-114, 117-119.)  In the PRT, Dr. Katz concluded Coleman had mild limitations in his activities of daily living; mild limitations in maintaining social functioning; and moderate limitations in concentration, persistence, or pace.  (Tr. 113.)  In the Mental RFC, Dr. Katz found Coleman not significantly limited in his ability to understand, remember, and carry out very short and simple instructions, or in his ability to maintain attention and concentration for extended periods. (Tr. 117-118.)  She found Coleman was, however, moderately limited in his ability to understand, remember, and carry out detailed

16

instructions.  (Tr. 118.)  In the narrative section of the form, Dr. Katz determined as follows:

> The [claimant] maintains the ability to carry out simple and mildly complex, 2-3 step tasks.  Ability to handle stress appears adequate.

> The [claimant] has a 20 year work [history] with the same employer.  He doesn't report any psych issues while working or with his performance.  However, evidence does indicate cognitive deficits which would impair his ability to carry out more complex tasks.

(*Id.*)

 On May 10, 2012, state agency physician Aracelis Rivera, Psy. D., reviewed Coleman's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 144, 148-149.)  In the PRT, Dr. Rivera agreed with Dr. Katz's assessment except that he found Coleman was moderately (as opposed to mildly) limited in his ability to maintain social functioning.  (Tr. 144.)  In the Mental RFC, Dr. Rivera found Coleman not significantly limited in his ability to understand, remember, and carry out very short and simple instructions, or in his ability to maintain attention and concentration for extended periods.  (Tr. 148.)  He found Coleman was moderately limited in a number of categories, including in his abilities to: (1) understand, remember, and carry out detailed instructions; (2) work in coordination with or in proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 148-149.)

In the narrative section of the form, Dr. Rivera agreed with Dr. Katz that Coleman maintained the ability to carry out simple and moderately complex, 2-3 step tasks.  (Tr. 149.)  He further found Coleman was limited to superficial interactions with supervisors, and "should perform work tasks relatively isolated from coworkers and . . should have no contact with the general public."  (*Id*.)

**D.      Hearing Testimony**

During the June 6, 2014 hearing,[7] Coleman testified to the following:

- He lives alone in a house.  (Tr. 29-30.)  He is 53 years old and weighs 298 pounds.  (Tr. 28-29.)

- He worked as a receiving checker at Giant Eagle for twenty years.  (Tr. 25-26.) He was fired from this job because he was "getting tired," "falling asleep at work," and "losing days coming to work late."  (Tr. 27.)  He was denied unemployment compensation.  (Tr. 28.)

- He suffers from foot and ankle pain due to flat feet.  (Tr. 28.)  He uses orthotic pads for his shoes but they makes things worse because they cause his ankles to stiffen up.  (Tr. 28, 32.)  He stated his feet are "actually blowing up like two baked potatoes."  (*Id*.)  His foot pain was "bad" in 2010, and has gotten progressively worse.  (Tr. 31-33.)  His foot pain is worse when he stands or walks "for a little while."  (Tr. 28, 31-33.)  He uses ice or heat to alleviate his pain.  (Tr. 33)  He sometimes needs to sit down for as long as six to eight hours before he can stand back up again.  (*Id*.)

---

[7] As noted *supra*, Coleman also participated in a hearing before a different ALJ in December 2012.  (Tr. 46-104.)  During that hearing, Coleman testified he suffered from pain and swelling in his hands and feet, excessive fatigue, liver disease, and diabetes. (*Id*.)  He stated he could lift and carry no more than 20 pounds, and could stand for no more than 10 to 15 minutes at one time.  (Tr. 79, 83-84.)  After standing for that length of time, he experienced foot pain and swelling and needed to lie down for "a good couple of hours" and elevate his feet.  (Tr. 83-84.)  With regard to his hands, Coleman testified he could not hold a cup of coffee, and sometimes had difficulty with zippers, buttons, and putting a shirt on over his head.  (Tr. 72, 88.)  Finally, Coleman testified he was " a loner" and had no friends.  (Tr. 71, 76-77.)  He also stated he had memory problems.  (Tr. 60.)

18

- He has also has problems with his hands.  (Tr. 34.) His "grip is not that good." (*Id.*)  Additionally, his hands "close up on him when he's sitting down."  (*Id.*)

- He suffers from diabetes but is not currently taking insulin.  (Tr. 29.)  He has taken a few nutrition and diabetes classes.  (*Id.*)  He agreed that his diabetes is under "decent control."  (*Id.*)

- He microwaves meals for himself, and goes shopping once every two weeks. (Tr. 30-31.)  A friend washes his clothes for him, and another friend does his shopping.  (*Id.*)  He used to cut the lawn, but no longer does it.  (*Id.*)

The VE testified Coleman had past work as a industrial truck operator (medium, semi-skilled) and a receiving checker (medium, semi-skilled).  (Tr. 36-39.)  The ALJ then posed the following hypothetical question:

> Hypothetical number one.  Light exertion, can occasionally stoop, kneel, and climb stairs and ramps.  Can frequently handle and finger, avoid hazards, such as moving machinery and unprotected heights.  As for mental, no limits on understanding, remembering or carrying out instructions.  Can maintain concentration, persistence, and pace for work that is SVP 1 through SVP 3, for work that is further described as work that can be learned within 90 days or with a short demonstration. * * * Can interact up to occasionally with coworkers, supervisors, and the public.  Can adjust to changes in the workplace setting.  All right, Mr. Anderson, as you review the hypothetical individual, can you tell me whether or not there is any work that can accommodate that person, because at light obviously he can't return to his two past jobs of medium?

(Tr. 39-40.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as inspector and hand packager (light, unskilled); electronics worker (light, unskilled), and assembler of electrical accessories (light, unskilled).  (Tr. 40.)

The ALJ then asked a second hypothetical as follows:

> Hypothetical number two would be light exertion.  Can occasionally stoop, kneel, climb stairs and ramps, avoid hazards, such as moving machinery, and unprotected heights, and no mental limits.  How does that impact your answer, sir?

19

(Tr. 40.)  The VE testified the hypothetical individual would be able to perform the three previously identified jobs.  (*Id.*)

The ALJ then asked a third hypothetical as follows:

> Hypothetical number three, light exertion.  And I'm going to say light exertion and can limit standing and walking to four hours maximum a day.  Can occasionally stoop, kneel, climb stairs and ramps, should avoid hazards, such as moving machinery and unprotected heights, and no mental limitations.

(Tr. 40-41.)  The VE testified such an individual would not be able to perform the inspector and hand packager job, but would be able to perform the electronics worker and assembler of electrical accessories as well as the job of mail clerk (light, unskilled).  (Tr. 41.)

The ALJ then asked a hypothetical that was the same as the third hypothetical but added the mental limitations from the first hypothetical; i.e., "no limits on understanding, remembering, or carrying out instructions, can maintain concentration, persistence, and pace, for work that is SVP 1 through SVP 3, for work that is further described as work that can be learned within 90 days or with a short demonstration.  Can interact up to occasionally with coworkers, supervisors, and the public and can adjust to changes in the workplace setting."  (Tr. 41-42.)  The VE testified such an individual could perform the electronics worker, assembler of electrical accessories, and mail clerk jobs.  (Tr. 42.)

Coleman's counsel then asked a hypothetical that was the same as the one above but added the limitation that "he would have to be relatively isolated from coworkers and have no contact with the public."  (Tr. 42.)  The VE testified there would be no unskilled jobs for such a hypothetical individual.  (*Id.*)  Counsel then asked the following hypothetical:

> And the same thing with the standing up to four hours in an eight hour workday. If he was standing and had to sit and could be standing half an hour, an hour, and then had to sit the rest of the day because his feet were bothering him too

much, could he do any of the light jobs?

(Tr. 42-43.)  The VE testified such an individual could perform the previously identified jobs "as long as he was on task when changing positions from sitting to standing."  (Tr. 43.)

Finally, Coleman's counsel asked whether there were jobs available for a hypothetical individual would be off task about 15% of the time because of pain.  (Tr. 43.)  The VE testified that "[i]f he's at 15 percent or above, it's unlikely he'd be competitive in terms of his production rate."  (*Id*.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

21

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Coleman was insured on his alleged disability onset date, October 10, 2009, and remained insured through December 31, 2014, his DLI.  (Tr. 194.)  Therefore, in order to be entitled to POD and DIB, Coleman must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

22

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since October 10, 2009, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: diabetes mellitus, obesity, and flat feet (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 419.925, and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally stoop, kneel, and climb ramps and stairs, and must avoid hazards such as moving machinery and unprotected heights.  There are no mental limitations.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on December ** 1960 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.    The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569,

23

404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 10, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 194-203.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

24

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

25

## VI.  ANALYSIS

### Failure to Follow Appeals Council Order on Remand

In his first assignment of error, Coleman argues the ALJ erred by "failing to evaluate or even consider the directives made by the Appeals Council regarding [his] impairments of antisocial personality disorder and depression."  (Doc. No. 10 at 10.)  In March 2014, the Appeals Council vacated the first ALJ decision (dated January 2, 2013) and remanded, as follows:

> Under the authority of 20 CFR 404.977 and 416.1477, the Appeals Council vacates the hearing decision and remands this case to an Administrative Law Judge for resolution of the following issues:
>
> • The hearing decision finds that the claimant has moderate difficulties in social functioning and with concentration, persistence, or pace as a result of his severe mental impairments (Decision, p. 4).  However, the residual functional capacity assessment in Finding No. 5 does not contain any limitations commensurate with the "B" criteria finding that claimant is limited in his ability to maintain concentration, persistence or pace.  The "B" criteria assessments are supported by substantial evidence including medical source opinions from Dr. Pickholtz, Dr. Katz, and Dr. Rivera.  Further evaluation of the functional impact of these limitations is required.
>
> • The hearing decision does not contain an evaluation of the claimant's obesity under Social Security Ruling 02-1p.  The claimant is six feet tall and his weight was 279 pounds in January 2012 (Exhibit 4F).  The claimant's Body Mass Index calculates to 37.8 which, according to the National Institute of Health and Social Security Ruling 02-1p, falls under the category of obese.  Consideration of the claimant's obesity and its functional impact on his functioning is necessary.
>
> Upon remand, the Administrative Law Judge will:
>
> • Consider the nature and severity of the claimant's obesity (Social Security Ruling 02-1p).
>
> • Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific

references to evidence of record in support of the assessed limitations
(20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16
and 96-8p).

- If warranted by the expanded record, obtain supplemental evidence
from a vocational expert to clarify the effect of the assessed
limitations on the claimant's occupational base (Social Security
Ruling 83-14).  The hypothetical questions should reflect the specific
capacity/limitations established by the record as a whole.  The
Administrative Law Judge will ask the vocational expert to identify
examples of appropriate jobs and to state the incidence of such jobs
in the national economy (20 CFR 404.1566 and 416.966).  Further,
before relying on the vocational expert evidence the Administrative
Law Judge will identify and resolve any conflicts between the
occupational evidence provided by the vocational expert and
information in the Dictionary of Occupational Titles (DOT) and its
companion publication, the Selected Characteristics of Occupations
(Social Security Ruling 00-4p).

In compliance with the above, the Administrative Law Judge will take any
further action needed to complete the administrative record and issue a new
decision.

(Tr. 188-189.)

Coleman maintains the second ALJ violated the Appeals Council's Order of Remand by

(1) finding he did not have any severe mental impairments, and (2) failing to include any mental

limitations in the RFC.[8]  Specifically, he asserts "the ALJ accorded little weight to [the opinions

---

[8]  Coleman does not argue that the first ALJ's step two finding and/or RFC determination
were binding on the second ALJ pursuant to *Dennard v. Sec'y of Health & Human
Services*, 907 F.2d 5989 (6th Cir. 1990) and *Drummond v. Comm'r of Soc. Sec.*, 126
F.3d 837 (6th Cir. 1997).  Any such argument would be without merit as the only final
decision in this matter is the second ALJ's August 2014 decision.  *See e.g., Wireman v.
Comm'r of Soc. Sec.*, 60 Fed. Appx 570, 571 (6th Cir. 2003) ("The only final decision in
this case is the March 15, 2000 hearing decision which is now before this court.  All
other decisions relevant to Wireman's social security disability insurance benefits never
became final as they were vacated pursuant to remands for further proceedings.
Therefore, Wireman's contention that the ALJ was bound by the findings of ALJ Cogan
is meritless."); *Davis v. Callahan*, 1998 WL 228056 (6th Cir. 1998) ("Under *Dennard*,
collateral estoppel applies to a prior final decision.  In this case, the Appeals Council

27

of Drs. Pickholtz, Katz, and Rivera] in making her RFC finding of no mental limitations, which was in direct opposition to the Appeals Council's determination that these opinions were considered to be substantial evidence supporting Mr. Coleman's severe mental impairments." (*Id*.)  Coleman asserts the ALJ failed entirely to address his anti-social personality disorder, arguing "the VA records consistently document Mr. Coleman's antisocial traits and difficulty with interpersonal communication."  (*Id*. at 14.)  Finally, Coleman maintains the ALJ failed to comply with the Appeals Council's directive to further evaluate Coleman's moderate difficulties in concentration, persistence, or pace, noting "Dr. Pickholtz specifically opined Mr. Coleman's capacities for attention and concentration fell within the low average to borderline range."  (*Id*. at 13.)

The Commissioner argues the ALJ complied with the Appeals Council's Remand Order.  (Doc. No. 12 at 17.)  She asserts the second ALJ was not bound by the first ALJ's decision because the first ALJ decision was vacated by the Appeals Council.  (*Id*. at 18.)  The Commissioner then argues the Appeals Council did not make any determination regarding Coleman's mental limitations and, further, that nothing in the Order of Remand precluded the second ALJ from reaching a different conclusion on that issue.  Finally, the Commissioner argues that, "even if this Court were to determine that [the ALJ] did not follow the Appeals Council order, remand is not appropriate" because there has been no consensus within the Sixth Circuit regarding the reviewability of an ALJ's failure to follow the Appeals Council's Order. (*Id*. at 20-21.)

---

vacated the 1992 decision.  Therefore, the 1992 decision was not a final decision and *Dennard* is not applicable.").

20 C.F.R. § 416.1477(b) provides that an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." Federal courts are not in agreement regarding "whether an ALJ's failure to follow Appeals Council directives in a remand order may serve as independent grounds for reversal absent other error." *Godbey v. Colvin*, 2014 WL 4437647, at *5 (W.D. Ky. Sept. 9, 2014) (citing *Schults v. Colvin*, 1 F.Supp.3d 712, 716 (E.D. Ky. 2014)). "Differing opinions exist not only between circuits, but also among courts within the Sixth Circuit, which has not considered this particular issue." *Schults*, 1 F. Supp.3d at 716 (citing *Brown v. Comm'r of Soc. Sec.*, 2009 WL 465708 (W.D. Mich. Feb.24, 2009); *Salvati v. Astrue*, 2010 WL 546490 (E.D. Tenn. Feb.10, 2010)). Some courts consider an ALJ's failure to comply with directives of the Appeals Council to be a procedural error rising to the level of a denial of fair process. *See e.g., Godbey*, 2014 WL 4437647 at *6–7; *Salvati*, 2010 WL 546490 at *4–8. Others (including at least one decision from this District) assume, without deciding, that such an error may serve as an independent ground for reversal. *See e.g., Keating v. Comm'r of Soc. Sec.*, 2014 WL 1238611, at *15 (N.D. Ohio Mar. 25, 2014); *Kearney v. Colvin*, 14 F. Supp.3d 943, 950 (S.D. Ohio 2014); *Shults*, 1 F. Supp.3d at 716.

"The overwhelming majority of courts in this circuit, however, have determined that federal courts lack jurisdiction to consider whether an administrative law judge complied with the Appeals Council's instructions on remand." *Shope v. Comm'r of Soc. Sec.*, 2015 WL 3823165 at * 8 (S.D. Ohio June 19, 2015) (collecting cases) *report and recommendation adopted*, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015). *See also O'day v. Comm'r of Soc. Sec.*, 2015 WL 225467, at *6 (W.D. Mich. Jan. 16, 2015); *Verschueren v. Comm'r of Soc. Sec.*, 2014

29

WL 4925866, at *10 (W.D. Mich. Sept. 30, 2014); *Caldwell v. Colvin*, 2014 WL 3747548, at *3

(E.D. Ky. July 29, 2014); *Cooper v.  Colvin*, 2014 WL 2167651, at *2 (W.D. Ky. May 23, 2014);

*Prichard v. Astrue,* 2011 WL 794997, at *15 (M.D. Tenn. Feb. 28, 2011), *report and*

*recommendation adopted*, 2011 WL 1113755 (M.D. Tenn. Mar. 25, 2011); *Peterson v. Comm'r*

*of Soc. Sec.*, 2010 WL 420000, at *7 (E.D. Mich. Jan. 29, 2010).  In *Shope*, the district court

explained the reasoning behind this conclusion as follows:

> When the Appeals Council denies a claimant's request for review, the
> decision of the administrative law judge becomes the final decision of the
> Commissioner.  *Casey v. Secy. of Health & Human Servs.*, 987 F.2d
> 1230, 1233 (6th Cir.1993) (citing 20 C.F.R. § 404.955).  Under such
> circumstances, a court called upon to review the final decision of the
> Commissioner of Social Security is confined to a review of the
> administrative law judge's decision and the evidence presented to the
> administrative law judge.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d
> 469, 477 (6th Cir. 2003) (citing *Wyatt v. Sec'y of Health & Human Servs.*,
> 974 F.2d 680, 685 (6th Cir. 1992)).  **"Whether an ALJ complies with an**
> **Appeals Council order of remand is an internal agency matter which**
> **arises prior to the issuance of the agency's final decision."  *Brown*,**
> **2009 WL 465708 at *6.  The Appeals Council had an opportunity to**
> **review the administrative law judge's compliance with its directives,**
> **and it did not remand the matter a second time.  This Court has no**
> **authority to review the decision of the Appeals Council, *see Cline v.***
> ***Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996), and "Section**
> **405(g) does not provide this court with authority to review intermediate**
> **agency decisions that occur during the administrative review process."**
> ***Brown*, 2009 WL 465708 at *6.**

*Shope*, 2015 WL 3823165 at * 9 (emphasis added).  *See also Davis for I.D., a minor v. Astrue,*

2016 WL 5957616 at * 3 (W.D. Tenn. Oct. 14, 2016); *Sisson v. Colvin*, Case No. 5:15CV552

(N.D. Ohio Feb. 26, 2016), *report and recommendation adopted*, 2016 WL 3360509 (N.D. Ohio

June 14, 2016); *Sharay v. Comm'r of Soc. Sec.*, 2016 WL 8114220 at * 15-16 (E.D. Mich. Aug.

28, 2016), *report and recommendation adopted*, 2016 WL 5539791 (E. D. Mich. Sept. 30,

2016); *Llaneza v. Comm'r of Soc. Sec.*, 2016 WL 4054918 at * 12-13 (S.D. Ohio July 29, 2016),

*report and recommendation adopted by*, 2016 WL 4398673 (S.D. Ohio Aug. 18, 2016).

The Court agrees with the above reasoning and concludes it lacks jurisdiction to consider whether the second ALJ exceeded the scope of the Appeals Council's  Order of Remand.  This reasoning is particularly persuasive in the instant case as the Appeals Council reviewed the ALJ's August 2014 decision following the original remand and denied Coleman's request for review.  (Tr. 2-5.)  *See Llaneza*, 2016 WL 4054918 at * 13 ("Here, the Appeals Council had an opportunity to review the ALJ's compliance with its directives upon appeal of ALJ Keller's decision.  The Council, however, did not remand the matter a second time. This Court has no authority to review the decision of the Appeals Council."); *Brown*, 2009 WL 465708 at * 6 ("By failing to remand the matter a second time, it appears that the Appeals Council considered the ALJ's . . . review to be in compliance with the Council's previous order of remand. . ."); *Davis*, 2016 WL 5957616 at * 3 (same).

Accordingly, it is recommended that Coleman's first assignment of error be denied.

***Obesity***

Coleman next argues the ALJ failed to properly evaluate his obesity in compliance with Social Security Ruling ("SSR") 02-1p.  (Doc. No. 10 at 15.)  He acknowledges the ALJ "mentioned Coleman's obesity several times," but argues the ALJ's "passing references" to obesity do not sufficiently explain how she reached her conclusion regarding whether obesity caused any physical or mental limitations.  (*Id*. at 16.)  In particular, Coleman asserts the ALJ failed to mention several of his highest BMI ratings and, further, failed to consider how his "morbid obesity either caused or exacerbated" his hypertension, obstructive sleep apnea, bilateral ankle arthritis, flat feet, and diabetes.  (*Id*.)  He maintains "[i]t is difficult to reason, and

the ALJ failed to explain, how Mr. Coleman would be able to perform two-thirds of the workday standing and walking based only on his morbid obesity, let alone in combination with his other conditions contributing to his pain, swelling, stiffness, and ongoing fatigue."  (*Id*. at 19.)

The Commissioner argues "the ALJ properly considered the effects of Plaintiff's obesity at every relevant step in her decision."  (Doc. No. 12 at 21.)  She notes the ALJ recognized Coleman's obesity as a severe impairment at step two; considered his obesity at step three in connection with the listing requirements for musculoskeletal, respiratory, and cardiovascular impairments; and expressly "revisited Plaintiff's obesity in her RFC analysis" at step four.  (*Id*. at 21-22.)  The Commissioner notes the ALJ imposed physical functional limitations in the RFC that are specifically identified in SSR 02-1p as accommodating obesity, including restrictions to occasional stooping, kneeling, and climbing of ramps and stairs. Finally, the Commissioner maintains the ALJ did not improperly fail to consider the effect of Coleman's obesity on his sleep apnea and lower extremity pain and swelling, arguing Coleman has failed to identify any medical evidence establishing his obesity had any greater impact than was determined by the ALJ in the RFC.  (*Id*. at 23-24.)

The Sixth Circuit has recognized that "an ALJ 'must consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.'"[9]  *Shilo v.*

---

[9]  The Social Security Administration ("SSA") considers obesity to be a medically determinable impairment.  SSR 02–1 p, Introduction, 2002 WL 34686281 at *1. Although the Listings previously included obesity as an impairment, the SSA deleted it in 1999, and added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  *Id*.  The SSA also recognizes that obesity may cause or contribute to mental impairments such as depression or the loss of mental clarity due to obesity-related sleep apnea.  SSR 02–1 p, Policy Interpretation Question 2, 2002 WL 34686281 at *3.

*Comm'r of Social Security*, 600 Fed. Appx. 956, 958 (6th Cir. 2015) (quoting *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009)).  *See also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834-835 (6th Cir. 2016).  As explained in SSR 02-01p, "[o]besity is a complex, chronic disease characterized by excessive accumulation of body fat."  SSR 02–01p, 2002 WL 34686281, at *2.  It must be considered throughout the ALJ's determinations, "including when assessing an individual's residual functional capacity," precisely because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  *Id.* at *1.

That being said, the Sixth Circuit has found that SSR 02-01p "does not mandate a particular mode of analysis of obesity."  *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. 2006).  *See also Shilo*, 600 Fed. Appx. at 959; *Miller*, 811 F.3d at 835.  Rather, the Ruling "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations."  *See Bledsoe*, 165 Fed. Appx. at 411-412 ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.")  Therefore, to the extent Coleman's brief suggests the ALJ violated SSR 02-01p by failing to perform an analysis of his obesity in a particular manner, his argument lacks merit.

Here, the Court finds the ALJ's decision reflects that she considered Coleman's obesity at the relevant steps of the sequential analysis.  At step two, the ALJ specifically identified obesity as one of Coleman's severe impairments, noting it caused more than a minimal limitation in his ability to perform basic work activities.  (Tr. 196.)  The ALJ then found, at step three, that Coleman's obesity did not meet or equal the severity of a listing, explaining as follows:

> Finally, the claimant is obese.  Obesity is no longer considered a listed impairment.  Nevertheless, the Social Security Administration has recognized that obesity may be disabling in and of itself and may dramatically worsen other medical conditions (SSR 02-01p).  For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  This is especially true of musculoskeletal, respiratory, and cardiovascular impairments.  Here, the record does not support a finding that the claimant's combination of impairments, including obesity, meets or medically equals the criteria of any other listed impairment.

(Tr. 198.)

At step four, the ALJ noted at the outset that she "has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . ."  (Tr. 199.)  In discussing Coleman's diabetes, the ALJ then specifically noted Coleman "continues to be obese, weighing approximately 279 pounds with a BMI of 37.8."  (*Id*.)  Additionally, when assigning "great weight" to the opinion of consultative examiner Dr. Sioson, the ALJ acknowledged Coleman's obesity as follows:

> Great weight is given to the opinion of Dr. Sioson, who performed the consultative physical examination on January 9, 2012 and concluded that the claimant would be limited to light work based on his limitation on range of motion from pain and other clinical findings **because this is consistent with the evidence in the record which notes that the claimant has obesity and flat feet, but normal sensation, normal muscle strength, and normal gait on physical examination.**

(Tr. 200) (emphasis added).[10]  The ALJ also afforded "great weight" to the opinions of state agency physicians Drs. Hughes and McKee, both of whom explicitly accounted for Coleman's

---

[10] As noted *supra*, Dr. Sioson diagnosed Coleman with hypertension/sleep apnea, diabetes mellitus, and obesity.  (Tr. 558.)  Indeed, with regard to Coleman's obesity, Dr. Sioson noted he weighed 279 pounds and had a BMI of 37.8.  (Tr. 557-558.)  Dr. Sioson considered Coleman's obesity when concluding he could perform light work, noting "if one considers limitation of range of motion from pain and above findings, work-related activities would be limited to light work."  (*Id.*)

obesity.  (*Id.*)  Specifically, Dr. Hughes and Dr. McKee opined Coleman had various postural

limitations "due to obesity, DM [i.e., diabetes mellitus], and reported breathing problems."  (Tr.

116, 147.)  Finally, the ALJ again acknowledged Coleman's obesity at the conclusion of her step

four analysis, finding as follows:

> In sum, **the evidence establishes that the claimant's pes planus or flat feet
> in combination with his diabetes and obesity with a BMI of around 37.8**
> would limit the claimant to a residual functional capacity of light work with
> occasional stooping, kneeling, and climbing of ramps and stairs but must
> avoid hazards such as moving machinery and unprotected heights.  20 CFR
> 404.1567(b) and 416.967(b).

(Tr. 201) (emphasis added).

In light of the above, the Court finds the ALJ did not, as Coleman suggests, make only a

"passing reference" to his obesity or address his obesity in isolation.  Rather, the ALJ adequately

addressed Coleman's obesity and expressly considered its combined impact on Coleman's other

impairments (including his diabetes and flat feet) at each step in the sequential evaluation.

Moreover, by assigning "great weight" to the opinions of Drs. Sioson, Hughes, and McKee (each

of whom considered Coleman's obesity), the ALJ incorporated the effect of Coleman's obesity

in formulating the RFC.  *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir.

2010) ("[W]hen assigning Coldiron an RFC, the ALJ considered RFCs from physicians who

explicitly accounted for Coldiron's obesity. . .   Thus, by utilizing the opinions of these

physicians in fashioning Coldiron's RFC, the ALJ incorporated the effect that obesity has on the

claimant's ability to work into the RFC he constructed."); *Bledsoe*, 165 Fed. Appx. at 412

(finding an ALJ does not need to make specific mention of obesity if he credits an expert's report

that considers obesity); *Miller*, 811 F.3d at 835 (noting an ALJ satisfies SSR 02-1p "so long as

she credits 'RFCs from physicians who explicitly accounted for [the claimant's] obesity.'").  *See*

*also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (stating "although the ALJ did not explicitly consider [claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.").

Coleman argues the ALJ's analysis was insufficient because she failed to acknowledge his BMI readings of 39.5 and 40.3. (Doc. No. 10 at 16.) He also complains the ALJ failed to consider the effect of his obesity in combination with his obstructive sleep apnea and hypoxemia, both of which "cause severe daytime sleepiness." (*Id.* at 17.) Finally, he argues the ALJ failed to consider the impact of his obesity on his hypertension and lower extremity pain and swelling. (*Id.* at 18.) The Court rejects these arguments. Coleman points to no medical opinion that physical functional limitations beyond those included in the RFC are required to account for his impairments.

As noted above, Drs. Sioson, Hughes and McKee each recognized Coleman's obesity and other physical impairments but nonetheless found he could perform a reduced range of light work. Moreover, neither Dr. Kirsch nor Dr. Schechter (both of whom were well aware of Coleman's obesity, hypertension, sleep apnea, excessive hypoxemia, and lower extremity pain and swelling) submitted opinions indicating Coleman had physical functional limitations greater than those set forth in the RFC. To the contrary, both of these physicians appear to have believed Coleman's impairments were not disabling. Indeed, in September 2011, Dr. Kirsch noted Coleman "has NO known reason that he can not work." (Tr. 444.) In November 2011, Dr. Schechter concluded "none of [Coleman's] diagnoses are disabling from work." (Tr. 615.) Moreover, as the Commissioner correctly notes, the RFC finding accounts for Coleman's obesity by finding he can only "occasionally stoop, kneel, and climb ramps and stairs, and must avoid

36

hazards such as moving machinery and unprotected heights."[11]  (Tr. 198.)

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly considered Coleman's obesity and its combined impact on Coleman's other impairments when determining the RFC.  Coleman's second assignment of error is without merit.

### RFC Assessment

In his third assignment of error, Coleman argues "substantial evidence does not support the ALJ's finding that Coleman is capable of performing light work."  (Doc. No. 10 at 19.)  He maintains "the objective evidence supports Mr. Coleman's testimony regarding his limitations with walking and standing, given his extreme obesity, fatigue, and lower extremity pain, swelling, and stiffness."  (*Id*. at 20.)  Coleman claims the evidence supports a finding of no more than sedentary work, "which at his age [age 53 at the time of the decision] directs a finding of disabled in accordance with the Grid rules."  (*Id*.)

The Commissioner asserts the ALJ fully accounted for all of Coleman's limitations in the RFC and reasonably determined he could perform a reduced range of light work.  (Doc. No.

---

[11]  The Court also notes that, while the ALJ may not have explicitly referenced the slightly higher BMI readings noted by Coleman the ALJ clearly recognized Coleman suffered from obesity at several points in the decision.  She also found Coleman had a BMI of "around 37.8,"which is not drastically different from his other readings of 39.5 and 40.3.  Additionally, the ALJ acknowledged Coleman's lower extremity pain and swelling at step four in the context of his flat feet.  (Tr. 199.)  The ALJ noted Coleman had pain, swelling, and reduced range of motion; however, she cited medical evidence indicating Coleman had intact sensation, full muscle strength, no evidence of edema, and was able to walk normally without an assistive device.  (*Id*.)  Finally, with regard to Coleman's sleep apnea, the ALJ found this condition non-severe at step two due to Coleman's treatment with a CPAP machine, failure to use the CPAP as prescribed, and his statement to Dr. Schechter in February 2012 that he did not need further follow up regarding his obstructive sleep apnea.  (Tr. 197.)  Coleman does not challenge the ALJ's step two finding herein.

12 at 11.)  She notes the ALJ properly found him lacking in credibility for several reasons, including treatment notes indicating Coleman stated "I found out that if I do have depression, it helps with my social security case so the more stuff I can pile on, the better to help with my case."  The Commissioner also argues the ALJ properly considered the opinion evidence regarding Coleman's physical limitations, noting "his primary treating physicians emphatically stated that he could work."  (*Id.* at 12.)  Lastly, the Commissioner argues the ALJ did not err in omitting mental limitations from the RFC, citing VA treatment records indicating normal mental status examinations and only slight impairment in concentration, persistence, or pace.

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3rd Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...]

38

contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7,

1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical

source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the

adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to

determine, however, it is well established that the claimant bears the burden of establishing the

impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th

Cir. 1999).

Here, at step two, the ALJ found Coleman suffered from the severe impairments of

diabetes mellitus, obesity, and flat feet.  (Tr. 196.)  She concluded Coleman's transaminase

elevations, sleep apnea, and depression were "non-severe," which Coleman does not challenge

herein.  (Tr. 196-198.)  With regard to Coleman's depression, the ALJ concluded as follows:

> The evidence further indicates that the claimant has depression.  The claimant
> underwent a consultative psychological evaluation performed by Hershel
> Pickholtz, Ed.D., on December 22, 2011 and he diagnosed the claimant with a
> depressive disorder, NOS but he described it as mild.  He also assigned a GAF
> of 61, which indicates mild limitations.  (Exhibit 2F).  Records from the VA
> also note a GAF of 60, which suggests mild limitations.  (Exhibit 5F, p. 15;
> 6F, p. 20).  Additionally, the VA records indicate that the claimant does not
> need psychiatric medication because he is not endorsing psychiatric
> symptoms.  (Exhibit 5F, p. 43.)

(Tr. 197.)  The ALJ concluded Coleman had no limitation in his activities of daily living due to

his mental impairment, and had only a mild limitation in social functioning.  (*Id*.)  With regard to

concentration, persistence, or pace, the ALJ found as follows:

> The third functional area is concentration, persistence, or pace.  In this area,
> the claimant has a mild limitation.  Dr. Pickholtz concluded at the time of the
> consultative exam that the claimant's capacities to perform 1 to 3 step tasks
> for unskilled and low skilled labor were slightly impaired.  He also concluded
> that the claimant's capacities to handle the pressure of work comparable to
> previous work capacities fell in the slight range of impairment. (Exhibit 2F, p.

39

9.)

(Tr. 198.)

After determining Coleman did not meet or medically equal a listing, the ALJ went on, at step four, to discuss the medical evidence regarding Coleman's flat feet, type II diabetes mellitus, and obesity.  (Tr. 199-200.)  She found Coleman's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible" for the following reasons:

> In a psychiatry consult note from the VA dated March 14, 2012, the claimant was quoted as saying "that he wanted help getting SSD" and "I found out that if I do have depression, it helps with my social security case so the more stuff I can pile on, the better to help with my case."  (Exhibit 5F, p. 11.)  He also denied alcohol and drug use and then contradicted himself by saying he was drunk on New Year's Eve and almost accidentally shot himself in the head.  (Exhibit 5F, p. 12.)  He was diagnosed at that time with [rule/out] malingering for financial gain.  (Exhibit 5F, p. 15.)  In addition, it was noted that the claimant never mentioned grief issues until the entire assessment was completed and was told that no medications would be offered and he then stated "oh by the way, my girlfriend died."  (Exhibit 5F, p. 11.)  Finally, the claimant testified at his hearing that he was fired from Giant Eagle for falling asleep at work, but VA records indicate he was fired for performance and attendance problems.  (Exhibit 5F, p. 15.)

(Tr. 200.)  The ALJ also observed that "no treating physician has offered an opinion that the claimant has disabling functional limitations and no medical opinion has been expressed that is consistent with the conclusion that the claimant cannot work."  (*Id*.)  The ALJ noted that, in fact, Dr. Kirsch and Dr. Schechter indicated in treatment notes that there was "no known reason that [Coleman] cannot work" and "none of his diagnoses are disabling from work."  (*Id*.)

The ALJ then evaluated the opinion evidence.  She accorded "great weight" to the opinions of consultative examiner Dr. Sioson and state agency physicians Drs. Hughes and McKee, that Coleman could perform a range of light work.  (*Id*.)  The ALJ evaluated the opinion

40

evidence regarding Coleman's mental impairments as follows:

> Some weight is given to the consultative psychological examination
> performed by Dr. Pickholtz on December 22, 2011.  Dr. Pickholtz noted that
> the claimant's capacities for pace and persistence fell in the average range and
> his capacities to perform 1 to 3 step tasks for unskilled and low skilled labor
> are slightly impaired which is consistent with the evidence in the record that
> the claimant does not have a severe mental impairment.  However, he also
> indicated that the claimant's capacities for attention and concentration fell in
> the low average and borderline ranges which is not supported by the
> psychiatric patient notes from the VA and Dr. Pickholtz's own findings at the
> consultative psychological exam.  (Exhibit 2F).

> Little weight is given to the State Agency psychological assessments
> completed by Bonnie Katz, Ph.D., on January 3, 2012 and Aracelis Rivera,
> Psy.D. on May 10, 2012 which concluded that the claimant [had] moderate
> difficulties in social functioning and moderate difficulties in concentration,
> persistence, and pace because VA records and the consultative exam
> performed by Dr. Pickholtz show that the claimant is only slightly impaired in
> these areas.  Moreover, Dr. Katz and Dr. Rivera concluded that the claimant
> should be relatively isolated from co-workers and have no contact with the
> public and these findings are not supported by evidence in the record, which
> establishes that the claimant talks with friends and relatives twice a month and
> socializes with friends twice a month.  He also has friends that help him with
> household chores. (Exhibits 3A, 4A, 7A, 8A).

(Tr. 200-201.)

The ALJ formulated the following RFC: "After careful consideration of the entire

record, the undersigned finds that the claimant has the residual functional capacity to perform

light work[12] as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally stoop,

---

[12]  "Light work" is defined as follows: "Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this category when it requires
a good deal of walking or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls. To be considered capable of performing
a full or wide range of light work, you must have the ability to do substantially all of
these activities."  20 CFR §404.1567(b).  Social Security Ruling 83–10 clarifies that
"since frequent lifting or carrying requires being on one's feet up to two-thirds of a
workday, the full range of light work requires standing or walking, off or on, for a total of

kneel, and climb ramps and stairs, and must avoid hazards such as moving machinery and unprotected heights.  There are no mental limitations."  (Tr. 198.)

As set forth in his third assignment of error, Coleman focuses on the physical functional limitations set forth in the RFC, arguing the medical evidence supports a finding of no more than sedentary work.[13]  The Court disagrees.  There is no opinion evidence in the record supporting Coleman's argument that he is limited to sedentary work.  As the ALJ correctly notes, Coleman's treating physicians (Dr. Kirsch and Dr. Schechter) did not offer any opinions indicating Coleman had physical functional limitations greater than those set forth in the RFC and, in fact, made notations in treatment notes indicating they did not believe Coleman's impairments were disabling.  (Tr. 444, 615.)  Moreover, and as has been discussed previously, Drs. Sioson, Hughes and McKee each opined Coleman could perform a reduced range of light work.  (Tr. 115-117, 146-147, 558.)  The ALJ also correctly notes the medical record contains physical examination findings that Coleman walked normally with no assistive device and had intact sensation, 5/5 muscle strength, no edema, and no muscle atrophy.  (Tr. 554-558, 786-787.) While Coleman testified he experiences significant foot pain when standing or walking, the ALJ

approximately six hours of an 8–hour workday." SSR 83-10, 1983 WL 31251 (1983).

[13] "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a).  SSR 83-10 provides that "Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251 (1983).

found him to be lacking in credibility for a number of reasons.  Notably, Coleman does not challenge the ALJ's credibility analysis in the instant appeal.  Accordingly, the Court finds substantial evidence supports the physical functional limitations set forth in the RFC.

The Commissioner interprets Coleman's brief as also arguing the ALJ erred in failing to include mental limitations in the RFC.  To the extent Coleman's brief is interpreted to advance such an argument, the Court finds it without merit.  Again, Coleman does not direct this Court's attention to any treating physician opinion indicating Coleman has any specific mental functional limitations.  While Dr. Pickholtz found Coleman's capacities for attention and concentration fell "in the low average to borderline ranges," the Court finds the ALJ properly discounted this opinion on the grounds it was not supported by VA treatment notes.

As noted *supra*, prior to his first psychiatric visit at the VA in November 2011, Coleman reported no history of psychiatric treatment or medication.  (Tr. 608.)  When asked why he was seeking psychiatric help at that time, Coleman stated "I found out that if I do have depression it helps with my social security case, so the more stuff I can pile on the better to help with my case."  (Tr. 608-609.)  Dr. Anderson found Coleman "did not endorse any psychiatric symptoms during interview, therefore medication or psychotherapy is not indicated at this time." (Tr. 611.)  At a subsequent visit several months later, Dr. Anderson found Coleman was alert, oriented and cooperative with normal speech and motor activity; a full affect; and linear, logical and goal oriented thought process.  (Tr. 603.)  She found Coleman "continues to be without psychiatric symptoms at this time."  (Tr. 603-604.)  While clinical nurse special Phyllis Goldbach recommended therapy several months later due to "anger issues, violent tendencies, and possible med seeking for secondary gains," Coleman refused group therapy.  (Tr. 667.)  Ms.

43

Goldbach assessed anti-social personality disorder, but did not feel medication was warranted. (Tr. 666-667.)

Based on the above record, the Court finds substantial evidence supports the ALJ's rejection of Dr. Pickholtz's finding that Coleman had a "low average to borderline" capacity for concentration and attention.[14]  Coleman has not directed this Court's attention to any VA treatment records supporting his claim that he suffers from moderate limitations in concentration, persistence, or pace.  Indeed, to the contrary, in both of Coleman's visits with Dr. Anderson, she expressly found no evidence of psychiatric symptoms and therefore declined to prescribe medication or recommend therapy.  Moreover, as noted *supra*, the ALJ found Coleman lacking in credibility, in part due to his statement that a diagnosis of depression would help with his disability claim.  Again, Coleman does not challenge the ALJ's credibility assessment herein. Accordingly, the Court finds it was not improper for the ALJ to reject this portion of Dr. Pickholtz's opinion.

For the same reasons, the Court finds the ALJ properly discounted the assessments of state agency physicians Drs. Katz and Rivera that Coleman had moderate limitations in concentration, persistence, and pace.  The Court further finds the ALJ properly discounted Dr. Rivera's conclusion that Coleman was moderately limited in social functioning and "should perform work tasks relatively isolated from coworkers and . . . should have no contact with the general public."  (Tr. 149.)  The ALJ rejected Dr. Rivera's opinion on the grounds it was

---

[14]  The Court also agrees with the ALJ that Dr. Pickholtz's finding that Coleman's capacities for attention and concentration "fall in the low average and borderline ranges" is arguably inconsistent with his contemporaneous finding that Coleman's "capacities to understand, remember, and carryout instructions fall in the slight range of impairment." (Tr. 552.)

inconsistent with evidence indicating Coleman talks with friends and relatives twice a month,

socializes with a friend twice per month, and has friends that help him with household chores.

Moreover, Dr. Pickholtz found Coleman was only slightly impaired in his capacities to relate to

coworkers and supervisors (Tr. 552), and Dr. Katz similarly found Coleman had only mild

limitations in social functioning (Tr. 113, 118.)  Accordingly, the Court finds substantial

evidence supports the ALJ's decision not to include mental functional limitations in the RFC.

Therefore, and for all the reasons set forth above, the Court finds Coleman's third

assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

_s/ Jonathan D. Greenberg_

Jonathan D. Greenberg

United States Magistrate Judge

Date: February 17, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**